## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **DENNIS WINDSOR,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:16-CV-934-L** |
| | § | |
| **JEFF OLSON and NERIUM** | § | |
| **INTERNATIONAL, LLC,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are Plaintiff's Motion for Summary Judgment Against Defendant Nerium International, LLC's Counter[c]laims (Doc. 115), filed January 18, 2019; Defendant Nerium International, LLC's Brief in Support of its Response to Plaintiff's Motion for Summary Judgment Against Nerium's Counterclaims (Doc. 127), filed February 8, 2019; Plaintiff's Reply to Defendant Nerium International, LLC's Response to Plaintiff's Motion [for] Summary Judgment on Nerium's Counterclaims (Doc. 136), filed February 22, 2019; Defendants' Motion for Partial Summary Judgment (Doc. 110), filed January 18, 2019; Plaintiff's Memorandum in Support of its Response to Defendants' Motion for Partial Summary Judgment (Doc. 130), filed February 8, 2019; and Defendants' Reply in Support of Motion for Partial Summary Judgment (Doc. 135), filed February 22, 2019.

After carefully considering the motions, briefs, record, and applicable law, the court **grants** Defendants' Motion for Partial Summary Judgment (Doc. 130) and **grants in part and denies in part** Plaintiff's Motion for Summary Judgment Against Defendant Nerium International, LLC's Counter[c]laims (Doc. 115). Specifically, the court **grants** Defendants' motion for partial summary judgment as to Plaintiff's federal and state law claims. The court **denies** Plaintiff's

motion for summary judgment with respect to Nerium's counterclaims under the Defend Trades Secret Act ("DTSA") and Texas Uniform Trade Secrets Act ("TUTSA"); its state common law claims for breaches of fiduciary duty and duty of loyalty, and conversion; and declaratory judgment of no copyright infringement and invalidity. The court **grants** Plaintiff's motion for summary judgment with respect to Nerium's counterclaim for declaratory judgment that it has copyright ownership in the alleged works and **denies** it with respect to Nerium's counterclaim for declaratory judgment of no copyright infringement, copyright invalidity, and implied license.

## I.      Factual and Procedural History

Plaintiff Dennis Windsor ("Windsor" or "Plaintiff") filed this action against Defendants Nerium International, LLC ("Nerium") and its sole manager and CEO, Jeff Olson ("Olson") (collectively, "Defendants") on April 5, 2016, alleging state law claims and a federal copyright claim that arise from Windsor's participation in the development of Nerium, a multi-level marketing company that sells anti-aging and wellness products. Plaintiff's Third Amended Complaint ("Third Amended Complaint") specifically asserts claims against Defendants for copyright infringement, breach of contract, fraudulent inducement, promissory estoppel, unjust enrichment, and it also seeks declaratory and injunctive relief related to those claims.

The operative, undisputed facts are as follows: Sometime in 2009, Olson recruited Windsor to join him in developing a network marketing company that would later become Nerium. Nerium launched commercial operations and began selling products on August 29, 2011. During the development phase, Windsor worked as an independent contractor and, after Nerium launched, he became an employee and held the position of Nerium's first president. He was terminated on March 30, 2016.

According to Windsor, Olson recruited him to develop the company by offering three terms related to Windsor's future compensation upon Nerium's official launch: (1) a commission rate that would correspond with a "top" position, later referred to within Nerium as "The Marketing Group Three Star National Marketing Director – ID 10006"; (2) a 15% royalty on all back-office subscription fees generated; (3) and a five percent equity ownership in Nerium with distributions. Pl.'s Third Am. Compl., Doc. 19, ¶ 22; Pl.'s Resp., Doc. 130 at 37. In exchange, Windsor would assist Olson in designing, running, and promoting the company. Windsor and Olson never memorialized these alleged terms into a written agreement. Windsor contends that Defendants have failed to pay him the compensation pursuant to these alleged terms and, therefore, breached their alleged oral agreement. Pl.'s Third Am. Compl, Doc. 19, ¶ 23.

Windsor further contends that, during the approximate two-year development of Nerium, he "worked essentially by himself" designing, building, and launching Nerium, during which time he created marketing material, a business model, and a compensation structure for its salesforce. Pl.'s Third Am. Compl., Doc. 19, ¶ 8; Pl.'s Resp., Doc. 130 at 12. Windsor contends that he has a copyright in the documents he created during this period and that Nerium is currently infringing by using exact copies and derivatives of those works without his permission. Pl.'s Third Am. Compl., Doc. 19, ¶ 27.

Windsor's Third Amended Complaint, filed July 27, 2016, lists ten specific works as the basis for his copyright infringement claim. On January 11, 2019, Windsor filed a motion for leave to file a fourth amended complaint that removed eight[1] of these works from his copyright

---

[1] Windsor's Motion for Leave to File Plaintiff's Fourth Amended Complaint (Doc. 101) stated that he wished to dismiss seven of the ten works. After comparing the Third Amended Complaint and proposed Fourth Amended Complaint (Doc. 101-1), the court determines that Plaintiff sought to remove the following eight works from his pleading: (1) Nerium MLM 3X3X10 Structured Distribution Model, (2) Nerium MLM Placement Suite, (3) Nerium MLM 3URFREE Customer Acquisition Model, (4) Nerium MLM Business Launch Kit, (5) Nerium MLM Success Planner, (6) Nerium MLM BackOffice Contents & Navigation, (7) Nerium MLM BackOffice Premium Services, and (8) Nerium MLM Coaching Commissions. *Compare* Doc. 19, ¶ 27 *with* Doc. 101-1, ¶ 28. Moreover, in Plaintiff's

infringement claim on the basis that he had not received formal registration for them from the United States Copyright Office. The court denied Windsor's motion because he failed to move under the applicable procedural rule and, moreover, good cause did not exist for the court to grant his request at this stage of the now three-year-old litigation.

Defendants now moves for judgment as a matter of law with respect to all of Windsor's state common law claims on the basis that they are barred by the statute of limitations and also should be dismissed on the merits; moves for judgment as a matter of law on the merits of Windsor's copyright infringement claim; and moves for judgment as a matter of law on Windsor's claim for declaratory relief on the basis that it is duplicative of his copyright and contract claims in that it seeks resolution of matters that will be resolved as part of the determination of those claims.

Windsor moves for a judgment as a matter of law on Nerium's counterclaims, which assert counterclaims under the Defend Trade Secrets Act ("DTSA"); Texas Uniform Trade Secrets Act ("TUTSA"); declaratory judgments of copyright ownership, no copyright infringement, copyright invalidity, and implied license; and state law common law claims for breaches of fiduciary duty and duty of loyalty, and conversion.

## II.     Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.

---

Response to Defendants' Motion for Summary Judgment, he contends that his Motion for Leave sought to "drop[] the eight Works which, to date, have not received registrations." Doc. 130 at 50.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587. (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*,

136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.    Analysis

### A.  Windsor's Copyright Infringement Claim

Defendants contend that that they are entitled to summary judgment on Windsor's copyright infringement claim on several grounds. First, with respect to the "Compensation Plan" and "Roadmap to Success," Defendants challenge the validity of the copyright registrations that Windsor obtained for these works. They further contend that Windsor has failed to set forth evidence that these works are sufficiently original and thus protectable under copyright law on the basis that the works contain functional elements or ideas. Defendants further contend that Windsor, even if he could identify copyrightable elements of his works, has failed to set forth evidence of infringing works that are substantially similar to those allegedly copyrightable elements. Defendants also raise an estoppel defense as it relates to the "Compensation Plan." With respect to the remaining eight works alleged in Windsor's complaint, Defendants contend that they are entitled to judgment as a matter of law because Windsor admitted that he did not obtain copyright registrations for these works.

### 1. Copyright Infringement

To bring an infringement action, a party must first register his or her work with the Copyright Office. 17 U.S.C. § 411(a). "A certificate of registration, if timely obtained [before or within five years after first publication of the work], is prima facie evidence both that a copyright is valid and that the registrant owns the copyright." *General Universal Sys. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *see* § 17 U.S.C. §410(c). "However, certificates create only a rebuttable presumption that the copyrights are valid." *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995).

To establish a claim for copyright infringement, a plaintiff must prove that: (1) he or she owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original. *Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357, 367 (5th Cir. 2004) (citing *General Universal Sys.*, 379 F.3d at 141). With respect to the first element, "[c]opyright ownership is shown by proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities." *Eng'g Dynamics v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994).

To establish the second element, a plaintiff must prove: (1) factual copying and (2) substantial similarity. *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003). To assess substantial similarity, "a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as substantially similar." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 550 (5th Cir. 2015) (internal quotation marks and citation omitted). "However, where the copyrighted work contains unprotectable elements, the first step is to distinguish between protectable and unprotectable elements of the copyrighted work." *Id.* (citations omitted). "The next inquiry is whether the allegedly infringing

works bears a substantial similarity to the protectable aspects of the original work." *Id.* (citations omitted).

### 2. "Compensation Plan"

Defendants contend that they should be granted summary judgment on Windsor's copyright claim as to the "Compensation Plan" for three reasons: (1) Windsor cannot meet his burden of proving he owns a valid and enforceable copyright, (2) Windsor cannot meet his burden of proving "substantial similarity" between his alleged copyrighted work and any infringing work, and (3) Windsor is estopped from pursuing his claim. The court determines that Windsor has not established, or raised a genuine dispute of material fact, that he has a valid and enforceable copyright in the "Compensation Plan" and limits its discussion to this issue.

Defendants first argue that Windsor bears the burden of establishing he has a valid and enforceable copyright in the "Compensation Plan" because his copyright registration in this work was not made "before or within five years after first publication of the work" and is, therefore, not entitled to the benefit of a *prima facie* finding of validity afforded under the statute. *See* 17 U.S.C. § 410(c). ("In any judicial proceeding the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate."). The certificate of registration for the "Compensation Plan" shows that the work was published on March 11, 2011, and the application was filed more than five years later on April 2, 2016. Defs.' App., Doc. 112 at 379. Defendants contend that Windsor, on the final day of discovery, produced an application for supplementary registration of the "Compensation Plan" seeking to convert the application to "unpublished," but Windsor has not subsequently produced evidence that the application was granted. In Windsor's Response, he states that he has "since amended [the registration for the "Compensation Plan"] with

a Supplemental Registration converting it to a registration for an unpublished Work and filed a new application to register the published version," and cites to a span of fifty pages in his Appendix as proof of his contention. Pl.'s Resp., Doc. 130 at 50 n.120 (citing Pl.'s App., Doc. 131 at 160-210). After reviewing these fifty pages—several of which do not pertain to the "Compensation Plan"—the court finds no evidence that Windsor received a Supplementary Registration that would rebut Defendants' argument that his original registration, containing the March 11, 2011 publication date and April 2, 2016 registration date, effectively deprives him of the benefit of the rebuttable presumption of *prima facie* validity under 17 U.S.C. § 410(c). In the absence of any competent rebuttal evidence, the court accepts Defendants' argument that Windsor is not entitled to the presumption of *prima facie* validity for the "Compensation Plan" because he did not obtain a timely certification of registration for it.

Windsor, therefore, bears the burden of establishing that he has a valid copyright in the "Compensation Plan," which is shown "by proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities." *Eng'g Dynamics*, 26 F.3d at 1340. Originality requires "that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (citation omitted). By the plain terms of the statute, "[i]n no case" does copyright protection extend to any "idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied[.]" 17 U.S.C. § 102(b).

Defendants argue that the "Compensation Plan" does not meet the originality requirement because it is a "draft spreadsheet containing formulas for compensating participants in a multi-level marketing system and a chart listing products, prices, and printed materials for a number of

other multi-level marketing companies (apparently copied from other sources)." Defs.' Mot. for Partial Summ. J., Doc. 113 at 48. Defendants further argue that the "Compensation Plan" is unoriginal based on evidence that it was copied from a compensation plan by another networking company Visalus, which Windsor consulted when creating the plan for Nerium. Defs.' Mot. for Partial Summ. J., Doc. 113 at 44-45 (citing Defs.' App., Doc. 112 at 51-52, 117, and 243).

Defendants argue that the only evidence Windsor has set forth regarding the protectable elements of the "Compensation Plan" is his response to Interrogatory No. 7(c), wherein he identified the protectable elements of the work:

> With respect to DennisWindsorMLMPayPlan03112011-Registration Number: TX0008172978, the protected elements Plaintiff claims include, but are not limited to, the following: (1) the name "Brand Partner Compensation Plan"; (2) the slogan "Rewarding, Easy, Advantageous and Lucrative"; (3) "Relationship Marketing" (you, your team, your preferred customers); (4) "Fast Start Qualified"; (5) "Personal Customer's Commissions"; (6) "3UR Free"; (7) "Success Pack Bonus"; (8) "Weekly Promoter's Pool"; (9) "Senior Director Bonus"; (10) "Coaching Commissions"; (11) "Success Pack Differential Bonus"; (12) "Marketing Director Pool"; (13) "Team Commissions"; (14) Leadership Development Bonus"; (15) "Special Promotions"; (16) "Executive Director Trip"; (17) "Brand Partner Ranking"; (18) "Team Structure"; (19) "Sponsor Tree"; (20) "Placement Tree"; (21) "First Order Bonus"; and (22) "Unilevel Commissions". In addition to the above, Plaintiff also claims protection for the fonts, colors, arrangement of text and graphics within this registered work.

Defs.' App., Doc. 112 at 267. Defendants contend that, of these twenty-two textual phrases asserted by Windsor as the copyrightable elements of the "Compensation Plan," only five appear in the work: (1) "Personal Customer Commissions," (2) "Leadership Development Bonus"; (3) "Sponsor Tree"; (4) "First Order Bonus"; and (5) "Unilevel Commissions." Defs.' Mot. for Partial Summ. J., Doc. 113 at 44 (*comparing* Certified Copy of Deposit for Compensation Plan, Defs.' App., Doc. 112 at 378, 400-01, *with* Am. Interrog. Resp. No. 7(c), Defs.' App., Doc. 112 at 267).

Defendants argue that these five textual phrases appearing in the work are ineligible for copyright protection because they are expressions that are "dictated solely at functional considerations." Defs.' Mot. for Partial Summ. J., Doc. 113 at 45 (quoting *CMM Cable Rep, Inc. v. Ocean Coast Props.*, Inc., 97 F.3d 1504, 1519 (1st Cir. 1996)). Defendants cite *CMM Cable Rep* for its holding that "copyright law denies protection to fragmentary words and phrases and to forms of expression dictated solely at functional considerations on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection." 97 F.3d at 1519 (internal quotation marks and citations omitted). Defendants contend that phrases in the "Compensation Plan" such as "First Order Bonus" are functional in that they define a compensation system and information contained therein and, therefore, are unoriginal and ineligible for copyright protection.

With respect to that portion of Windsor's interrogatory response claiming protection for "the fonts, colors, arrangement of text and graphics within this registered work," on March 12, 2019, United States Magistrate Judge David L. Horan ("Judge Horan") ruled on Defendants' Motion to Exclude Evidence based on Plaintiff's Late-Supplemented Response to Nerium's Interrogatory 7(c) and determined that Windsor:

> is prohibited from introducing evidence relating to his untimely contentions regarding the protectable elements of his "Copyrighted Work Product" – specifically, the claims of "protection for the fonts, colors, arrangement of text and graphics within [each] registered work" listed in his January 14, 2019 supplemental answer to Interrogatory No. 7(c) – in support of any motion or at any hearing or the trial of this case.

ECF Doc. 139 (Electronic Order). Judge Horan determined that this portion of Windsor's answer was supplemented to his answer on the discovery cutoff date, and, therefore, he failed to timely supplement as required by Federal Rule of Civil Procedure Rule 26(e). Windsor did not appeal this order to the district court within the 14-day period permitted under Federal Rule of Civil

Procedure 72(a). Windsor has accordingly waived his right to appeal the order, and Judge Horan's ruling is the law of the case with respect to this issue. Accordingly, in determining the protectable elements of the "Compensation Plan" asserted by Plaintiff, the court may not consider "the fonts, colors, [and] arrangement of text and graphics" within the work.

In his Response, Windsor's sole argument as to the copyrightability of the "Compensation Plan" is that it is an original arrangement of data, which the court is foreclosed from considering in light of Judge Horan's order. *See* ECF Doc. 139 ("Windsor is prohibited from introducing evidence relating to his untimely contentions regarding the protectable elements of his "Copyrighted Work Product" – specifically, the claims of 'protection for the . . . *arrangement of text and graphics* within [each] registered work.'") (emphasis added). Windsor contends that the "Compensation Plan" is original pursuant to *Feist*, in which the Supreme Court held that a factual compilation may possess the requisite originality to receive copyright protection if the "choices as to selection and arrangement" of the collected data entails a "minimal degree of creativity." *Feist*, 499 U.S., at 348. Windsor argues that the "Compensation Plan" contains "copyrightable expression embodied in Windsor's selection, coordination and arrangement" of the data contained therein. Pl.'s Resp., Doc. 130 at 54. He argues that Defendants copied the "textual instructions and checklists," "graphics and the selection and arrangement of the materials presented." Pl.'s Resp., Doc. 130 at 54. Windsor does not respond to Defendants' argument that the textual elements in the "Compensation Plan" are not copyrightable because they are fragmentary, functional phrases considered unoriginal under copyright law.

The court determines that Windsor has failed to meet his burden of establishing that he has a valid and enforceable copyright in the "Compensation Plan," as required under the first element for asserting a copyright infringement claim. As the court previously discussed, Windsor bears the

burden of establishing that the work is copyrightable because the copyright registration for this work shows that it was not timely procured pursuant to 17 U.S.C. § 410(c) and, therefore, is not entitled to a *prima facie* finding of validity. Windsor has not set forth any evidence that the "Compensation Plan" bears the minimal degree of creativity required for copyright protection. Windsor makes a conclusory argument that the "Compensation Plan" is an original factual compilation. Notwithstanding Judge Horan's order precluding Windsor from arguing that he has a copyright in the "Compensation Plan" based on its arrangement of text and graphics, Windsor fails to explain the basis for his assertion that the selection, placement, and arrangement of the information in the "Compensation Plan" is sufficiently original. The court's review of the "Compensation Plan" leads it to conclude that it contains an unoriginal spreadsheet of rows and columns with textual description and numerical percentages, lacking any graphics and featuring information relating to commissions and bonuses that correspond to various Nerium "brand partner" rankings. Defs.' App., Doc. 112 at 400-402.[2]

The only other summary judgment evidence regarding the copyrightable elements of the "Compensation Plan" is Windsor's answer to Interrogatory No. 7(c), wherein he lists five short,

---

[2] The court notes that, in reviewing the "Compensation Plan," it relied on the spreadsheet in Defendants' Appendix because this is the only competent summary judgment evidence of this work in the record. Defendants properly authenticated this work through the Declaration of Lance Henderson, in which he states that Exhibit I (containing the "Compensation Plan" work) is a "true and correct cop[y] of certified documents received by Nerium's counsel from the United States Copyright Office" for the work "DennisWindsorPayPlan03112011," which is the title Windsor used to register the "Compensation Plan" work. Defs.' App., Doc. 112 at 378, ¶ 5. Windsor failed to produce any competent summary judgment evidence of the "Compensation Plan" because he did not properly authenticate the document cited to in his Appendix as constituting the work. Pl.'s App., Doc. 131 at 151. Unauthenticated documents are improper as summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994). To authenticate public records such as certificate and copyright registration deposit materials, Windsor could provide "testimony that a matter is what it is claimed to be or evidence that the certificates and deposit materials are obtained from the Copyright Office". *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4366990, at *8 (S.D. Tex. Oct. 27, 2010) (citing Fed. R. Evid. 901(b)(1) and 901(b)(7)). While the certificate of registration itself bearing the Copyright Office's seal may be self-authenticating, Windsor has failed to provide evidence, such as a sworn declaration, that the accompanying work is a true and correct copy of the deposit that he submitted to obtain the registration. Windsor has accordingly failed to provide competent summary judgment evidence of the work, and the court will rely on the copy produced by Defendants. Moreover, Windsor does not contest the authenticity of the "Compensation Plan" work relied upon by Defendants in their motion for partial summary judgment.

**Memorandum Opinion and Order – Page 13**

textual phrases that appear in the "Compensation Plan": (1) "Personal Customer Commissions," (2) "Leadership Development Bonus"; (3) "Sponsor Tree"; (4) "First Order Bonus"; and (5) "Unilevel Commissions." "The Copyright Act, [however], does not protect fragmentary words or short phrases." *Taylor v. IBM*, 54 F. App'x. 794 (5th Cir. 2002) (citing 37 C.F.R.§ 202.1(a) and *CMM Cable Rep, Inc.*, 97 F.3d at 1519-20) (dismissing a copyright infringement claim in part because the short phrase "pre paid cash card" featured in the copyright registration deposit was not subject to copyright protection). Windsor is not entitled as a matter of law to a valid and enforceable copyright in the fragmentary phrases that are listed in his response to Interrogatory No. 7(c) and that appear in the "Compensation Plan" spreadsheet.

As Windsor has failed to set forth evidence to raise a genuine dispute of material fact that the "Compensation Plan" is copyrightable, the court need not reach the second element regarding the substantial similarity between the "Compensation Plan" and Nerium's allegedly infringing work, an analysis which focuses on the protectable elements of the infringed work. As there is no evidence establishing that protectable elements exist in the "Compensation Plan," Defendants are entitled to judgment as a matter of law on Windsor's copyright infringement claim with respect to this work.

### 3. "Roadmap to Success"

Defendants argue that the court should grant them judgment as a matter of law on Windsor's copyright infringement claim based on the "Roadmap to Success" work for the following reasons: (1) he did not plead a work "Roadmap to Success" in his complaint and instead pleaded the work "MLM Roadmap to Lexus" for which he did not produce evidence of a copyright registration; (2) the copyright registration for the work was obtained fraudulently and is, therefore,

invalid; and (3) Windsor has failed to show substantial similarity between the alleged copyrighted and infringing works.

Defendants first contend that Windsor failed to plead the "Roadmap to Success" work because "Roadmap to Success" does not appear as one of the ten listed works under his copyright claim in the Third Amended Complaint. The Third Amended Complaint, rather, lists a work titled "MLM Roadmap to Lexus." Pl.'s Third Am. Compl., Doc. 19, ¶ 26. Defendants contend that Windsor, through "slight of hand" in his proposed Fourth Amended Complaint (which the court denied him leave to file), attempted to substitute a different registered work for what was originally pleaded by pleading a work titled "RoadMap to Success (a/k/a Roadmap to Lexus)." *See* Doc. 101-1 ¶ 27. Defendants contend that the copyright registration Windsor associates with the "Roadmap to Success" bears a dissimilar title, "DennisWindsorRoadMaptoSuccess/Lexus," which further fails to correspond with the originally pleaded "MLM Roadmap to Lexus."

A complaint pleading a copyright infringement claim must satisfy only the minimal notice-pleading requirements of Federal Rule of Civil Procedure 8 ("Rule 8"). *Arista Records LLC v. Greubel*, 453 F. Supp. 2d 961, 965 (N.D. Tex. 2006) (citations omitted). Under Rule 8, a plaintiff must provide a short and plain statement of the claim that gives the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *Id.* (citing Fed. R. Civ. P. 8(a)(2) and *Swierkiewicz v. Sorema* N.A., 534 U.S. 506, 512 (2002)). "The simplified notice-pleading standard relies on liberal discovery rules and summary-judgment motions to define the disputed facts and issues and dispose of meritless claims." *Id.* (citing *Swierkiewicz*, 534 U.S. at 512). In this case, the court determines that Windsor's Third Amended Complaint complied with Rule 8 by asserting "MLM Roadmap to Lexus." Defendants were sufficiently put on notice that Windsor intended to assert that he had a copyright in a work he later referred to as "Roadmap to Success," which he

registered with the Copyright Office under the title "DennisWindsorRoadMaptoSuccess/Lexus," as evidenced by Defendants' summary judgment briefing acknowledging the association of the two titles with the work at issue. The court, accordingly, determines that "Roadmap to Success" was sufficiently pleaded in light of the consistent use of the word "Roadmap" to refer to the work at issue, and Defendants were put on fair notice that this work would be asserted by Windsor as the basis for his copyright claim.

Defendants next argue that the registration for "Roadmap to Success" was fraudulently obtained and invalid. Defendants argue that an invalid registration cannot serve to create a rebuttable presumption of validity for purposes of establishing the first element of a copyright infringement claim. Defendants argue that an application for a copyright registration must include a bona fide copy of the original work, and the copy cannot be a reconstruction, pursuant to the registered deposit requirement set forth in *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998). *See also Geoscan Inc. of Texas v. Geotrace Technologies, Inc.*, 226 F.3d 387, 393 (5th Cir. 2000) (adopting the registration deposit requirement set forth in *Kodadek*). Defendants contend that, here, Windsor's copyright deposit is a 2016 fabrication rather than a bona fide copy of a 2011 original. Defendants rely on a document produced by Windsor in discovery that differs from the "Roadmap to Success" deposit submitted to the Copyright Office in that it: (1) features text in the margin communicating edits that need to be made, (2) uses the company name "Nerium" rather than "NewCo," and (3) has images of BMW automobiles. Defs.' Mot. for Partial Summ. J., Doc. 113 at 55 (citing Defs.' App., Doc. 112 at 386-87). Defendants also rely on an e-mail sent on August 4, 2016, from Dennis Windsor to Brenda Gibson, in which Ms. Gibson writes, "Here is the revised RoadMap to Success, taking out the edit notes and deleting the car information," to which he replies, "Change Nerium to NewCo on doc-Top left corner." Defs.' App., Doc. 112 at

417. As Windsor's Response fails to address or rebut these factual assertions regarding edits made in 2016 prior to the submission of the deposit, the court takes them as true. The court determines, however, that Defendants have not sufficiently demonstrated that Windsor committed fraud on the United States Copyright Office, which involves a showing that the registrant knowingly made material edits for the purpose of deceiving the Copyright Office. *See One Treasure Ltd., Inc. v. Richardson*, 202 F. App'x 658, 661 (5th Cir. 2006) (holding that "immaterial, inadvertent errors in an application for copyright registration do not jeopardize the registration[']s validity," but those that do invalidate a registration are made "intentional[ly] for the purpose of deceiving the Copyright Office"); *see also R. Ready Productions, Inc. v. Cantrell*, 85 F. Supp. 2d 672, 691 (S.D. Tex. 2000). Defendants have not set forth sufficient evidence to show that the deletions from the purported 2016 document are material or that they were made with a deceptive intent. Defendants further have not persuaded the court that the deposit submitted with the application was a "reconstruction" of the original "Roadmap to Success" diagram, irrespective of the edits made in 2016. The "reconstructions" considered in the cases cited by Defendants involved a deposit that was wholly recreated, without reference to the original. *Kodadek*, 152 F.3d at 1212 (in which the registrant submitted a deposit of drawings which were made from his memory of the original drawings and not made by "directly referring to the originals or bona fide copies of the originals"); *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1322 (9th Cir. 1986) (determining the copyright registration was not proof of validity because the deposit was a reconstruction and the registrant had failed to show that the reconstructions were "virtually identical" to those originals). Although Defendants have demonstrated that certain edits were made, there is insufficient evidence that the deposit was a total reconstruction of the "Roadmap to Success" diagram, without reference to the original. Taken in the light most favorable to Windsor, the court reasonably infers that the

"Roadmap to Success" diagram for which Windsor obtained a copyright looks virtually identical to the diagram featured in the 2011 original documents, irrespective of a few immaterial changes that do not bear on the copyrightability of the work. The court, therefore, determines that the copyright registration creates a rebuttable presumption of validity and turns next to whether Defendants have sufficiently rebutted that presumption to be entitled to summary judgment as to this work.

Defendants argue that Windsor has failed to produce evidence that there are copyrightable elements in the "Roadmap to Success" work. Defendants specifically contend that Windsor's response to Interrogatory No. 7(c) asserts copyright protection in elements of the "Roadmap to Success" that are not protectable:

> (1) Entire Road to Lexus (Success) program [*See* Exhibit "A"]; (2) "Fast Start Qualify – First 30 Days"; (2) "Qualify As Director – First 60 Days"; (3) "Qualify As Sr. Director – First 90 Days". In addition to the above, Plaintiff also claims protection for the fonts, colors, arrangement of text and graphics within this registered work.

Defs.' Resp., Doc. 112 at 268. Defendants argue that "Entire Road to Lexus (Success) program" is an uncopyrightable idea, and the remaining textual elements—"Fast Start Qualify – First 30 Days," "Qualify As Director – First 60 Days," and "Qualify as Sr. Director – First 90 Days" are unoriginal and unprotectable short phrases. Defs.' Mot. for Partial Summ. J., Doc. 113 at 56. As noted previously, Windsor is foreclosed from seeking copyright protection in the "fonts, colors, arrangement of text and graphics" within the "Roadmap to Success" in light of Judge Horan's ruling on this issue, which Windsor did not appeal.

In his Response, Windsor wholly fails to respond to Defendants' argument that the "Roadmap to Success" program itself is an uncopyrightable idea and that the remaining alleged elements, such as "Fast Start Qualify – First 30 Days," are unoriginal and unprotectable short

phrases. Aside from inviting the court to review the "Roadmap to Success," Windsor does not set forth any argument as to copyrightability of the specific elements of the work to address Defendant's challenge to the presumption of validity afforded to the work's registration. When a plaintiff fails to defend a claim in response to a motion to dismiss or summary judgment motion, the claim is deemed abandoned. *See Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (concluding that the plaintiff abandoned her retaliatory abandonment claim when she failed to defend the claim in response to a motion to dismiss); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983) (explaining that a plaintiff, "in his opposition to a motion for summary judgment cannot abandon an issue and then . . . by drawing on the pleadings resurrect the abandoned issue."). The court accordingly determines that Windsor has abandoned the issue of whether he has a valid and enforceable copyright in the "Roadmap to Success" work.

The court, moreover, agrees with Defendants that the elements asserted by Windsor as the copyrightable elements of "Roadmap to Success" are not subject to copyright protection. In the response to Interrogatory No. 7(c), Windsor first asserts that he has a copyright in the "Entire Road to Lexus (Success) program"—but he does not elaborate in his Response or provide evidence as to what constitutes such program. Nevertheless, in reviewing the "Roadmap to Success," the court reasonably infers that the "program" to which Windsor refers is the multi-level marketing business model and how a brand partner can earn commissions, bonuses, and other rewards, and gain status within the company over a certain amount of time (30 days, 60 days, 90 days) through establishing connections with other brand partners. As noted by Defendants, the business model of a multi-level marketing scheme is not protectable under copyright law. *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure,

process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.").

The remaining alleged protected elements that Windsor has identified are the phrases: (1) "Fast Start Qualify – First 30 Days," (2) "Qualify as Director – First 60 Days"; and (3) "Qualify as Sr. Director – First 90 Days." *See* Defs.' App., Doc. 112 at 268. These phrases are featured in "Roadmap to Success" as what appear to be three steps to qualifying for certain promotional statuses as a brand partner and earning corresponding rewards over periods of time (30 days, 60 days, 90 days). These are "fragmentary words and phrases . . . dictated solely at functional considerations" and do not exhibit "the minimal level of creativity necessary to warrant copyright protection." *CMM Cable Rep, Inc.* 97 F.3d at 1519 (citations and internal quotation marks omitted). Windsor's response fails to address this flaw or identify any other specific protectable elements of the "Roadmap to Success" that the court should consider. Accordingly, the court determines that Defendants have rebutted the presumption of validity afforded to the copyright registration in "Roadmap to Success" and Windsor has failed to raise a genuine dispute of material fact that he owns a valid and enforceable copyright in the work. Defendants are accordingly entitled to judgment as a matter of law as to this work.

### 4. Remaining Eight Alleged Works

Defendants argue that they are entitled to judgment as a matter of law as to the remaining alleged copyrighted works in Windsor's Third Amended Complaint because Windsor cannot prove ownership of a valid copyright in any of these works. The court agrees. Windsor has acknowledged that he did not obtain copyright registrations in these remaining works. *See* Pl.'s Mot. for Leave, Doc. 101 at 1 (seeking leave to remove the remaining works from his Third Amended Complaint because he has not received formal registration of these works from the Copyright Office). To

bring an infringement action, a party must first register his or her work with the Copyright Office. *See* 17 U.S.C. § 411(a). As Windsor has failed to meet this statutory prerequisite for filing a copyright infringement claim, there is no genuine dispute of material fact regarding whether he is entitled to bring a copyright infringement claim as to these remaining works, and Defendants are entitled to judgment as a matter of law as to them.

## B. Supplemental Jurisdiction over Plaintiff's State Law Claims

Having granted summary judgment in favor of Defendants on Windsor's federal copyright claim and determining that it is to be dismissed, Plaintiff's state law claims for breach of contract, common law fraud, promissory estoppel, and unjust enrichment remain As there are no federal claims in this action, the court must determine whether to exercise supplemental jurisdiction over these state law claims.

Although the court can exercise supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a) "when all federal claims are dismissed or otherwise eliminated from a case prior to trial, [the Fifth Circuit has] stated that [its] 'general rule' is to decline to exercise jurisdiction over the pendent state law claims." *McClelland v. Gronwaldt*, 155 F.3d 507, 519 (5th Cir. 1998) (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989)), *overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433, 440 (5th Cir. 2003); *see Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992). To determine whether to exercise jurisdiction, the court balances "the statutory factors set forth by 28 U.S.C. § 1367(c)," "the common law factors of judicial economy, convenience, fairness, and comity," and the threat of "improper forum manipulation." *Enochs v. Lampasas Cty.*, 641 F.3d 155, 159 (5th Cir. 2011). The statutory factors are "(1) whether the state claims raise novel or complex issues of state law; (2) whether the state claims substantially predominate over the federal claims; (3) whether the federal claims have been

dismissed; and (4) whether there are exceptional circumstances or other compelling reasons for declining jurisdiction." *Id.* (citing 28 U.S.C. § 1367(c)).[3]

In determining whether the district court abused its discretion when deciding whether to exercise supplemental jurisdiction, the Fifth Circuit has considered the amount of time elapsed in the litigation, the length of time remaining until trial, and the amount of discovery completed. *See, e.g., Smith v. Amedisys, Inc.*, 298 F.3d 434, 447 (5th Cir. 2002) (common law factors favor retaining jurisdiction where "[t]he instant case has been pending for almost three years, the parties have taken numerous depositions, and the matter had progressed to the advanced stages of litigation with little left to do before trial"); *see also Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 456 (5th Cir. 1996) (finding abuse of discretion where case was dismissed less than one month before trial after two years of litigation, over 300 pleadings, and extensive discovery taken under federal rules). The Fifth Circuit has noted that the "case law is clear that when a district court declines to exercise jurisdiction over remaining state law claims following the dismissal of all federal-law claims and remands a suit after investing a significant amount of judicial resources . . . that court has abused its discretion under 28 U.S.C. § 1367." *Brookshire Bros. Holding, Inc. v. Dayco Products, Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) (citations omitted).

The court determines that the statutory and common law factors weigh in favor of exercising supplemental jurisdiction. With respect to the statutory factors, although the federal claim has been dismissed and the state law claims do predominate over the federal claim, the court

---

[3] **"These interests are to be considered on a case-by-case basis, and no single factor is dispositive."** ***Mendoza v. Murphy***, **532 F.3d 342, 346 (5th Cir. 2008) (internal citation omitted). "The overall balance of the statutory factors is important."** ***Enochs***, **641 F.3d at 159. In** ***Enochs***, **the court erroneously cites 28 U.S.C. § 1367(c). The statute has the conjunction "or" between the third and fourth factors therein, whereas,** ***Enochs*** **uses the conjunction "and," making it appear that the statute requires the presence of all four factors. The statute makes clear that any of the four factors can serve as an independent basis for the district court to decline to exercise supplemental jurisdiction over the state law claims. Despite the clear language of the statute, the court reluctantly follows** ***Enochs***.

does not believe that the state law claims present novel or complex issues of law or that exceptional circumstances exist to decline to exercise jurisdiction. With respect to the common law factors, the court finds that, at this late juncture of the proceedings, considerations of judicial economy, convenience, and fairness weigh in favor of retaining jurisdiction. The action has been pending in this court for three years and is set for trial on June 3, 2019. The parties have completed discovery, and each filed thorough motions for summary judgment. Several discovery disputes have been resolved by the magistrate judge, and the court recently resolved several motions that related to pretrial matters, including a motion to file a fourth amended complaint and is currently addressing detailed summary judgment motions. The court is familiar with the merits of the case and does not believe that judicial economy would be served by remanding this action to a state court judge to begin anew with the issues relevant to the remaining state law claims.

The court thus concludes that the statutory and common law factors collectively weigh in favor of exercising supplemental jurisdiction over Windsor's state-law claims. The court now addresses the motions for summary judgment with respect to these claims.

### C.     Windsor's Breach of Contract Claim

Windsor contends that, in "the early spring of 2009," Olson approached him with an offer to hire him as an independent contractor to help develop, run, and promote two new network marketing companies. Pl.'s Third Am. Compl., Doc. 19, ¶ 8. Windsor contends that Olson offered him the following terms: (1) a commission rate that corresponds with the position known at Nerium as "The Marketing Group Three Star National Marketing Director – ID 10006"; (2) a 15% royalty on all back-office subscription fees generated; (3) and a five percent equity ownership in Nerium with distributions. Pl.'s Third Am. Compl., Doc. 19, ¶ 22; Pl.'s Resp., Doc. 130 at 37 (citing Windsor's Depo., Pl.'s App., Doc. 131 at 22-24) . Windsor contends that, in exchange for this

compensation, he promised to: "work[] diligently to create and develop Defendant Nerium's company and business model, to grow Defendant Nerium's global business and distribution network, to develop and promote the Nerium Edge Monthly Subscription program/system, and [to] creat[e] Plaintiff's Copyrighted Work Product[.]" Pl.'s Third Am. Compl., Doc. 19, ¶ 22. Windsor contends that he fully performed these obligations, and Defendants have since failed to pay him pursuant to the contract's terms. Windsor contends that, by failing to make periodic payments and distributions, Defendants have committed multiple breaches of the contract that occurred "from April 5, 2012 to the present" and owe him damages in an amount of $21,125,000. Pl.'s Third Am. Compl. Doc. 19, ¶ 23.

The elements of a breach of contract claim under Texas law are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach*." Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (citation omitted). To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v. Jackson*, 155 Tex. 179, 284 (1955)). The court determines as a matter of law what the contract requires of the parties. *See Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied). The agreement's terms must be "sufficiently definite to 'enable a court to understand the parties' obligations,' and to give 'an appropriate remedy' if they are breached." *Id.* (citing Restatement (Second) of Contracts § 33(2) (1981)). If the agreement is so indefinite as to make it impossible for the court to determine the legal obligations of the parties, it is not enforceable. *Shin-Con Dev. Corp. v. I.P. Invs. Ltd.*, 270 S.W.3d 759, 765 (Tex. App.—Dallas 2008, pet. denied) (citation omitted). "As a general matter, Texas

courts have consistently held that a contract may be held void for indefiniteness if it fails to specify 'the time of performance, the price to be paid, the work to be done, the service to be rendered, or the property to be transferred.'" *Liberto v. D.F. Stauffer Biscuit Co., Inc.*, 441 F.3d 318, 324 (5th Cir. 2006) (quoting *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 960 S.W.2d 343, 352 (Tex. App.—Corpus Christi 1997, pet. denied)).

Defendants argue that Windsor's breach of contract claim fails as a matter of law for three reasons. First, Defendants argue that Windsor waived his rights under the alleged oral contract in e-mail communications with Olson in 2013 and 2014. Second, Defendants argue that the alleged oral agreement is unenforceable because it lacks consideration. Third, Defendants argue that the alleged oral agreement is unenforceable because it fails to specify essential terms and is, therefore, too indefinite. The court agrees with the third argument raised by Defendants and, therefore, it will only address this argument relating to the unenforceability of the alleged oral agreement.

Defendants contend that the alleged oral agreement fails to identify with sufficient certainty the obligations owed by both parties. Defendants state that Windsor, in his sworn testimony, stated that the agreement had "zero requirements from [him]" and his general obligation was to help "build the company" as a co-founder. Defs.' Mot. for Summ. J., Doc. 113 at 34-35. Defendants cite *Knowles v. Wright*, 288 S.W.3d 136 (Tex. App.—Houston [1st Dist.] 2009, pet. denied), in which a court considered an oral agreement for equity ownership in a gas drilling venture to be legally indefinite when the plaintiff promised to provide "consulting work at a reduced rate" and expend "best effort" to "[b]uild a business enterprise of which [he] would share half ." *Id.* at 143. The court determined that these terms failed to identify "what specific services [were] actually required of him." *Id.*  Defendants contend that, like the plaintiff in *Knowles*, Windsor allegedly

promised to build a company with Olson, but the alleged oral contract failed to offer any specifics about what exactly he was required to do in furtherance of that promise.

Defendants also argue that the alleged oral contract fails to provide essential terms regarding Defendants' obligations owed to Windsor. The term promising Windsor five percent equity ownership does not further "specify the type of entity, details of business ownership rights, where this 5% must come from, or who the other business partners would be." Defs.' Mot. for Summ. J., Doc. 113 at 35. With respect to the term promising Windsor certain commissions, Defendants contend that, at the time the alleged oral agreement was made in 2009, the parties "had not decided on a compensation plan for the unformed company that would define the method of calculating commissions." *Id*. Defendants contend that an alleged oral agreement promising "maximum commissions" when the compensation plan and method of calculating commissions have yet to be determined is so vague as to render such an agreement indefinite and unenforceable. *Id*. (citing *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 456-58 (Tex. App.—Fort Worth 2009, pet. denied)). Defendants further contend that, in 2009, the parties had not yet planned which types of products the company would sell and was evaluating a nutritional product called Forte rather than the skincare products that Nerium now markets. *Id*.

In response, Windsor argues as a preliminary matter that he is not suing on the initial agreement made between the parties in 2009 but on a subsequent agreement made in the fall of 2010—a contention that is inconsistent with the oral agreement alleged in his pleadings and one that has not been properly raised before the court. With respect to the obligations owed by the parties under the alleged contract, Windsor cites to deposition testimony indicating that Olson told various individuals about their "deal," specifically that Windsor was an owner and founder of Nerium and entitled to five percent equity in Nerium. Pl.'s Resp. Doc. 130 at 37-39. Windsor states

that Nerium's database reflected that Windsor was "the owner of the spot ID 10006" (which corresponds with his allegation that he was promised commission as a "Marketing Group Three Star National Marketing Director"). Pl.'s Resp., Doc. 130 at 13, 39. Windsor produces evidence of a scanned copy of a handwritten note, authenticated by a sworn declaration, that he made during a meeting with Nerium's general counsel to "memorialize" the "original deal," the contents of which include jotted notes with deal points that the court is largely unable to ascertain. Pl.'s Resp., Doc. 130 at 40; Pl.'s App., Doc. 131 at 12, 18. Rather than elaborate on what the deal points entail, or argue that they are sufficiently specific, Windsor states in conclusory fashion that "[t]he terms of this oral contract, as set out in Windsor's notes are sufficiently definite for the Court to understand and apply." Pl.'s Resp., Doc. 130 at 40.

Without specifically identifying his obligations under the contract, Windsor argues that he has "fully performed the obligations" because "Nerium was built, did launch, and was one of the most successful and fastest growing MLM companies in history," and Defendants "consistently held Windsor out as a co-founder of Nerium." Pl.'s Resp., Doc. 130 at 40-41 (citing Windsor Depo., Pl.'s App., Doc. 131 at 40, lines 5-16). These are mere conclusory assertions that do not identify which obligations Windsor was required to perform to become entitled to the compensatory terms to which he believes he is owed. Windsor contends that this case is similar to *Ameristar Jet Charter, Inc. v. Cope*, 2001 WL 950978, at *3-4 (Tex. App.—Dallas Aug. 22, 2001, no pet.). That case, however, involves an appellate review of a directed verdict in favor of a defendant on a breach of contract claim, which applies a scintilla of evidence standard and is not on point. *Id*. at *1. Moreover, the court in that case reviewed a narrow argument by the plaintiff regarding whether the contract, to be sufficiently definite, needed to include two specific terms regarding repayment and an interest rate. *Id*. at *4. The court determined that the contract

sufficiently set forth the repayment term and that an interest rate was not a material term required to make the alleged contract sufficiently definite. *Id*. The court emphasized that "[e]ach contract should be considered separately to determine its material terms." *Id*. at *2.

Windsor relies heavily on the recitation of three terms—the commission rate, entitlement to a percentage of back-office royalties, and equity ownership—but provides very little evidence about what he was he was required to do in his role as an independent contractor in developing and launching Nerium. In his deposition testimony, when asked what he was required to perform under the contract to receive the compensatory terms, Windsor stated, "I put my name on the line and my reputation to start that company. That was what gave me everything. And there was no performance required to get it, to keep it, to have it for the rest of my life. Zero performance requested." Defs.' App., Doc. 112 at 41 (lines 20-25). When pressed further to explain "the minimum that [he] needed to do to receive the top brand partner position, the equity[,] and the back office revenue," Windsor responded:

> So you're asking me at what point, to clarify that. It's when I agreed with Mr. Olson to accept his offer for us to join as partners and go build two great companies. The first company, where I would agree to that, that first company, was to run the company that he already had in place, PTN. In that same conversation, was to build the greatest company ever. So it was simply to join – to – to partner with him. There was no request ever of any performance. Did he ask me to do some things? I mean, that's just conversation, hey, will you fix this brochure, will you go meet with da, da, da, will you go do this. Performance has to do with real specific guidelines and – and direction. Mr. Olson never gave me any direction.

Defs.' App., Doc. 112 at 44 (lines 1-20). In response to a follow-up question, Windsor reiterated, "Again, my agreement with Jeff Olson for Company No. 2, NEWCO, which became Nerium, had zero requirements from me." Defs.' App., Doc. 112 at 45 (lines 6-8).

In light of these statements and the scant evidence produced by Windsor, the court is simply unable to ascertain what legal obligations he was to perform. At the least, Windsor invariably states there were "zero requirements" owed by him under the contract and at most, he states that he was required to "put[] his reputation behind the company" and provide consulting services, including designing, building, and launching Nerium. Pl.'s Resp., Doc. 130 at 10. These assertions are not sufficiently definite terms to create an enforceable contract.

The court further agrees with Defendants that *Knowles* is factually analogous and guides the outcome in this case. 288 S.W.3d at 139. In *Knowles*, the parties orally agreed to build a gas drilling company as a joint venture. *Id*. The defendant agreed to be the plaintiff's partner in "build[ing] a business," providing "consulting work," and "conceiving of the idea," and promised all of his "best effort" and "everything else, such as [his] blood, sweat, tears and anything else [he] could come up with to get it done," in exchange for 50% of the plaintiff's interests in the business after he had recovered costs. *Id*. at 139, 143. The trial court entered summary judgment in favor of the defendant on the plaintiff's breach of contract claim, on the basis that the oral contract was not sufficiently definite. The court affirmed the trial court's decision because the plaintiff "offered no testimony as to what specific services the oral contract actually *required* of him" and this "lack of definiteness" in regard to the work to be done and the services to be rendered was "fatal" to the claim for breach of contract." *Id*. at 143-44. The appellate court emphasized that the plaintiff "did not offer evidence as to what exactly he was obligated to do and what specific services he was required to provide . . . to build a business with [the defendant]—terms essential to the parties' purported oral contract to build a business and ultimately sell the shares of that business for profit." *Id*. at 144 (citing *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex. 2007)).

The court accordingly determines that Windsor has failed set forth evidence to raise a genuine dispute of material fact that the terms of the alleged oral contract were sufficiently definite to render the oral agreement enforceable. The court, therefore, determines that Defendants are entitled to judgment as a matter of law on Windsor's breach of contract claim.

### D. Windsor's Fraud/Fraudulent Inducement Claim

Windsor alleges that Olson made materially false representations with the specific intent of recruiting him to leave his employer VideoPlus and inducing him into developing, promoting, marketing, and building Nerium. Pl.'s Third Am. Compl., Doc. 19, ¶¶ 36-38. The allegedly false representations to which Windsor refers are the payment of commissions, royaltyies from subscription fees, and equity ownership. *Id.*, ¶ 36. Windsor alleges that he acted in reliance on Defendants' false representations and material omissions and was "thereby induced into spending years building Defendant Nerium's brand" and, as a result, incurred damages of $21,125,000. *Id.*, ¶ 40. This estimation of damages is identical to that alleged under Windsor's breach of contract claim for his expectation damages resulting from the alleged breaches of the contract. *Id.*, ¶ 24.

Defendants argue that the court should dismiss Windsor's claim for fraudulent inducement because the parties failed to form a binding agreement, which is required to recover the type of benefit-of-the-bargain damages that Windsor seeks. Defs.' Mot. for Partial Summ. J., Doc. 113 at 36 (citing *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)). Defendants argue that, in the absence of an agreement, a plaintiff pleading fraud is limited to recovering out-of-pocket expenses, which are measured by expenditures made in reliance on the purported fraud, less any value received. *Id.* (citing *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015)). Defendants contend that Windsor has not proffered any legal theory or evidence supporting the

recovery of out-of-pocket expenses. *Id*. Defendants also argue that Windsor has failed to prove the requisite element of deceptive intent. *Id*. at 37.

In response, Windsor argues that *Haase* is inapplicable because in that case, the court applied the statute of limitations in determining that the agreement was unenforceable. Pl.'s Resp., Doc. 130 at 43-44. Windsor argues that he is entitled to recover benefit-of-the-bargain damages calculated based on what he would have earned pursuant to the alleged compensatory terms. *Id*. at 44. Windsor does not contest that he has failed to plead a legal theory or any evidence supporting the recovery of out-of-pocket expenses. Windsor also argues that he has raised a genuine dispute of material fact as to the issue of intent based on Olson's failure to deliver the promises, his subsequent denial of ever making those promises, and his actions in preventing Windsor from seeing Nerium's financials. *Id*. at 44-45.

Under Texas law,

> Fraudulent inducement is a species of common-law fraud that shares the same basic elements: (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury. Fraudulent inducement is actionable when the misrepresentation is a false promise of future performance made with a present intent not to perform. Because fraudulent inducement arises only in the context of a contract, the existence of a contract is an essential part of its proof.

*Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) (citations omitted). In light of the court's ruling that no enforceable agreement was entered into by the parties, Windsor has failed to establish an essential element of his fraudulent inducement claim. Contrary to Windsor's assertion, the requirement that a party pleading a fraudulent inducement claim must prove the existence of a contract is not limited to cases that implicate the statute of frauds.

To the extent Windsor seeks to plead a fraud or misrepresentation claim, Windsor has also failed to establish evidence of an essential element of that claim. A fraud cause of action requires "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). When a party seeks damages for common-law fraud in the absence of an enforceable promise to perform, he or she is not available to benefit-of-the bargain damages, which are measured by the difference between the value as represented and the value received. *Anderson*, 550 S.W.3d at 614 (citations omitted). "[I]f there is a defect in contract formation, the only potentially viable measure of fraud damages is the out-of-pocket measure." *Zorrilla v. Aypco Construction II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (citing *Haase*, 62 S.W.3d at 799-800). As Windsor consistently maintains that he seeks damages based solely on benefit-of-the-bargain damages, he has not set forth evidence to establish the essential element of injury for a common law fraud claim, and, therefore, no genuine dispute of material fact exists with respect to this claim. Also, as previously discussed, there is no genuine dispute of material fact as to Windsor's fraudulent inducement claim because he has failed to set forth evidence that an agreement existed between the parties, which is an essential element of that claim. Accordingly, Defendants are entitled to judgment as a matter of law on the fraud/fraudulent inducement claims.

### E. Windsor's Promissory Estoppel Claim

Likewise for his promissory estoppel claim, Windsor solely pleads benefit-of-the-bargain damages of $21,125,000 that he contends he would have been owed under the alleged agreement. Pl.'s Third Am. Compl., Doc. 19 at 19-20. Defendants argue that Texas law does not permit the recovery of expectation damages in an action for promissory estoppel, which requires a plaintiff

to plead reliance damages. Defs.' Mot. for Summ. J., Doc. 113 at 39-40. Windsor fails to present any argument or evidence in response. In the absence of any evidence that he suffered reliance damages under a promissory estoppel theory of recovery, Windsor failed to raise a genuine dispute of material fact that he is entitled to relief on this claim. *Zenor v. El Paso Healthcare System, Ltd.*, 176 F.3d 847, 865-66 (5th Cir. 1999) ("Under Texas law, only reliance damages are recoverable for a promissory estoppel claim. . . .[C]ompensatory and expectancy interests [cannot] be categorized as reliance damages.") (citation omitted). As Windsor has failed to set forth evidence that he is entitled to reliance damages, the court determines that Defendants are entitled to judgment as a matter of law as to Windsor's promissory estoppel claim.

### F. Windsor's Unjust Enrichment Claim

Windsor asserts as an alternative claim the theory of unjust enrichment to the extent the court determines that no enforceable contract exists between the parties. Pl.'s Third Am. Compl., Doc. 19 at 21. Windsor alleges that "Defendants have benefited financially from Plaintiff[']s effort and service" and the "receipt of such benefit is unjust enrichment," for which Windsor seeks damages of $21,125,000, the amount he claims entitlement to under the alleged agreement. *Id.*

Defendants argue that unjust enrichment is not a separate cause of action under Texas law, as this court has previously held. Defs.' Mot. for Summ. J, Doc. 113 at 30 (*citing Fisher v. Blue Cross & Blue Shield of Tex., Inc.*, 2015 WL 5603711, at *12 (N.D. Tex. Sept. 23, 2015) ("[T]he vast majority of courts, including this court, now hold that unjust enrichment is not a separate cause of action."). In response, Windsor relies on Texas Supreme Court authority published prior to the court's ruling in *Fisher* and fails to address the court's established stance on this issue. This court has explained that, although the Texas Supreme Court has referred to "unjust enrichment claims," "those opinions do not characterize unjust enrichment as a separate cause of action from

money had and received" and rather "consider it to be a general theory of recovery for an equitable action seeking restitution." *Chapman v. Commonwealth Land Title Ins. Co.*, 814 F. Supp. 2d 617, 725 (N.D. Tex. 2011). Other federal courts have arrived at the same conclusion and considered some of the opinions cited by Windsor. *See, e.g., Hancock v. Chicago Title Ins. Co.*, 635 F. Supp. 2d 539, 560 (N.D. Tex. 2009) (holding that, though the Supreme Court of Texas and other courts still occasionally refer to an "unjust enrichment claim," such opinions do not characterize it as a separate cause of action from money had and received, and "consider it to be a general theory of recovery for an equitable action seeking restitution" (citing *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869 (Tex. 2007) and *HECI Expl. Co. v. Neel*, 982 S.W.2d 881 (Tex. 1998)).

Even if unjust enrichment were an independent cause of action, Windsor has not set forth any evidence that he is entitled to the type of recovery available under this theory. "Unjust enrichment . . . characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances [that] give rise to an implied or quasi-contractual obligation to repay." *Walker v. Cotter Properties, Inc.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.) (citations omitted). "The unjust enrichment doctrine applies principles of restitution to disputes [when] there is no actual contract and is based on the equitable principle that one who receives benefits which would be unjust for him to retain ought to make restitution." *Id.* (citations omitted). Windsor's unjust enrichment "claim" is duplicative of his breach of contract claim, and his Response does not set forth any evidence to show that Defendants were unjustly enriched. Moreover, Windsor seeks benefit-of-the-bargain damages based on the three compensatory terms he argues he was owed, but he does not set forth any competent summary judgment evidence

regarding the reasonable value of work performed in connection with the development and launch of Nerium.

As unjust enrichment is not an independent cause of action, Defendants are entitled to judgment as a matter of law as to this claim. Even if the claim is legally cognizable, Defendants are entitled to judgment as a matter of law as to this claim because Windsor fails to set forth evidence that he is entitled to restitution under an unjust enrichment theory of recovery.

### G. Windsor's Request for Declaratory Relief

In Windsor's prayer for relief in the Third Amended Complaint, he seeks fifteen declarations from this court that are duplicative of the relief sought in his federal and state substantive claims. Pl.'s Third Am. Compl., Doc. 19 at 23 (*see*, e.g. "Declaratory Judgment that: (a) Plaintiff is, and has been at all relevant times hereto, the Copyright owner of Plaintiff's Copyrighted Work Product . . . (f) That Defendant Olson and/or Defendant Nerium failed to pay Plaintiff what the Defendants had promised to pay Plaintiff").

Defendants argue that they are entitled to summary judgment with respect to Windsor's declaratory judgment claim because it is duplicative of other claims and, therefore, "seeks resolution of matters that will already be resolved" as part of Plaintiff's other claims. Def.'s Mot. for Partial Summ. J., Doc. 113 at 59 (citing *Ecoquij-Tzep v. Le Arlington, Inc.*, No. 3:16-CV-625-BN, 2018 WL 1737658, at *2-3 (N.D. Tex. Apr. 10, 2018)). In response, Windsor states, "As Plaintiff has raised genuine disputes as to material facts with regards . . . to his Copyrighted works, summary judgment on Plaintiff's requested Declaratory Judgment is improper." Pl.'s Resp., Doc. 130 at 58.

This court has previously declined in its discretion to adjudicate declaratory judgment actions that are duplicative of other claims in the same case. *Great American Ins. Co. v. Goin*,

2017 WL 4238698, at *4 (N.D. Tex. 2017) (citation omitted). Further, district courts in this Circuit regularly reject declaratory judgment claims seeking the resolution of issues that are the mirror image of other claims in a lawsuit. *Id*. (citing *American Equip. Co., Inc. v. Turner Bros. Crane and Rigging, LLC*, No. 4:13-CV-2011, 2014 WL 3543720, at *4 (S.D. Tex. July 14, 2014). As correctly noted by Defendants, Windsor's requests for declaratory relief are the mirror image of his federal and state claims in this action, specifically the copyright infringement and breach of contract claims, which the court has already resolved in the previous sections of this opinion. As Windsor's requests for declaratory relief are duplicative of other claims in this case, the court determines that Defendants are entitled to judgment as a matter of law as to these requests.

### H. Nerium's Counterclaims Under the Defend Trade Secrets Act and Texas Uniform Trade Secrets Act

Nerium asserts counterclaims against Windsor for trade secret misappropriation in violation of 18 U.S.C. §§ 1836-39 (DTSA) and Texas Civil Practice and Remedies Code § 134A.001 *et seq*. (TUTSA). Defs.' Answer, Doc. 20, ¶¶ 120, 133. Nerium contends that Windsor created unauthorized copies of its trade secret information after his termination and subsequently disclosed them without Nerium's authorization in legal pleadings and in connection with his work for a direct competitor of Nerium. *Id*., ¶¶ 124-25. Nerium contends that, upon his termination, Windsor deliberately destroyed the data on his work laptop before returning it to Nerium and secretly retained one or more electronic copies of at least some of the information he destroyed, including Nerium's trade secret information. *Id*., ¶ 128.

Windsor moves for summary judgment on these counterclaims on the basis that no evidence exists to establish the elements of these claims as set forth under the DTSA and TUTSA. Pl.'s Mot. for Summ. J., Doc. 117 at 13. Windsor further argues that Nerium has failed to allege that it suffered any damages caused by the alleged misappropriation.

In response, Nerium argues that the evidence establishes that a genuine dispute of material fact exists with respect to each challenged element of the trade secret claims Nerium has asserted. First, Nerium asserts that the confidential business information misappropriated by Windsor falls within the definition of a trade secret under both TUTSA and DTSA. The business information asserted by Nerium as trade secret information includes "brand-partner reports" (a list of Nerium's salesforce, also known as brand partners) and reports generated by Nerium to analyze its company's compensation payments to its brand partners. Def.'s Resp., Doc. 127 at 14, 16. Nerium asserts that it took reasonable measures to maintain the secrecy of this information by maintaining it on a password-protected computer system, limiting its access to a number of personnel, and implementing written employment policies governing access to and use of its confidential information. *Id.* at 16-17.

Under both the DTSA and TUTSA, a trade secret is defined as information, including financial data and lists of actual or potential customers or suppliers, that the owner has taken reasonable measures to keep secret and which derives independent economic value from not being generally known or readily ascertainable through proper means. *See TFC Partners, Inc. v. Stratton Amenities, LLC*, 2010 WL 369152, at *2 (W.D. Tex. Jan. 30, 2019); 18 U.S.C. § 1839(3); Tex. Civ. Prac. & Rem. Code § 134A.002(6). The court determines that Nerium has provided sufficient competent evidence—through the declarations of forensic investigator Ashraf Massoud and Nerium employee Amber Olson Rourke, as well as exhibits containing copies of the allegedly misappropriated information and the Nerium Employee Handbook—in support of its contention that Windsor stored on his personal electronic device Nerium financial data and brand-partner reports that are entitled to trade secret protection and that Nerium took reasonable measures to keep secret. Def.'s App., Doc. 128 at 216-361, 425-560. Windsor, in his reply, does not contest

that the financial data and brand-report reports are the types of information subject to trade secret protection.

Windsor argues that Nerium has failed to present evidence that he misappropriated its trade secrets because he properly acquired the trade secrets as part of his employment as Nerium's president and the Employee Handbook did not require him to return that property upon his termination. Pl.'s Reply, Doc. 136 at 4. Windsor argues that Nerium presents no evidence of any type of agreement, such as a confidentiality agreement or nondisclosure agreement, that required him to return its property upon his termination. Windsor argues that his continued possession of Nerium's property on his back-up electronic devices was, accordingly, not acquired by improper means. *Id*. Windsor further argues that Nerium has presented no evidence that he, either as an employee or after his termination, disclosed any of Nerium's alleged trade secrets without its consent. *Id*. Windsor argues that, upon his termination, he voluntarily agreed to a Preservation Agreement that "deleted and made unrecoverable all of Nerium's Claimed property from both Windsor's personal physical devices as well as all of Windsor's accounts with third-party email and storage providers." *Id*. at 5.

Nerium argues that, when Windsor returned Nerium's property pursuant to a demand in his termination letter as well as the termination policy in the Employee Handbook, he "eradicated all of the data before doing so" and "admits that he made and retained backup copies that he alleges 'contained all of the materials which were on the laptop.'" Def.'s Resp., Doc. 127 at 19-20. The termination letter to which Nerium refers, dated March 30, 2016, specifically states:

> I would also like to remind you of your responsibilities under the Non-Disclosure Agreement and Confidentiality Agreement you signed when you began your employment with the Company, as well as your recent acknowledgement of the 2015 Employee Handbook signed on July 19, 2015. Please contact me no later than Friday, April 1, 2016 to make arrangements to return any and all

> Company property that you have in your possession including
> computers, tablets, company car, badge, product, company
> materials, company credit card etc., and any other documents and
> electronic files you may have that contain Nerium's business
> information.

Def.'s App., Doc. 128 at 596. Nerium also cites to the "Termination of Employment" provision in

the April 2015 version of its Employee Handbook that states, in part:

> Any employee who terminates employment is required to return all
> Company Property including but not limited to equipment, files,
> records, badges, keys, and any other material that are property of the
> Company. Departing employees must retrieve personal belonging in
> coordination from the manager. This must be completed within 30
> days of termination. After 30 days, the remaining items will be
> donated to a local charity.

Def.'s App., Doc. 128 at 103.

Under TUTSA and DTSA, "misappropriation" includes the "[a]cquisition of a trade secret

of another by a person who knows or has reason to know that the trade secret was acquired by

improper means[.]" Tex. Civ. Prac. & Rem. Code § 134A.002(3)(A); 18 U.S.C. § 1839(5)(A).

Windsor effectively concedes that he made back-up copies of Nerium's information that resulted

in continued possession of its alleged trade secrets after he complied with returning his work

laptop. *See* Pl.'s Reply, Doc. 136 at 4. Windsor, rather, argues that he was not prohibited from

making these back-up copies because he never signed a nondisclosure or confidentiality

agreement. *Id*. at 2. The Employee Handbook, however, which Windsor does not dispute governed

his conduct, specifically includes a "Confidentiality" provision that requires employees to

maintain "confidential business information" in "strict confidence" and states that "[s]eparated

employees are also subject to the Non-Disclosure Agreement." Def.'s App., Doc. 128 at 122. The

court determines that, in light of the parties' arguments and the summary judgment evidence, that

a genuine dispute of material fact exists as to whether Windsor improperly acquired Nerium's

trade secrets by making back-up copies of those electronic files on his personal devices after he was instructed to turn over company property upon his termination.

Nerium also contends that Windsor misappropriated its trade secrets through improper disclosure. Under TUTSA and DTSA, "misappropriation" includes, in part, "disclosure or use of a trade secret of another without express or implied consent" by a person who, "at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret." Tex. Civ. Prac. and Rem. Code § 134A.002(3)(B)(ii)(b); 18 U.S.C. § 1839(5)(B)(ii)(II). Nerium contends that, following his termination, Windsor joined the company Jeunesse to develop its global sales force, and he disclosed and used Nerium's trade secrets on behalf of his new employer. Def.'s Resp., Doc. 127 at 21. Nerium specifically cites an e-mail thread in June 2016, between Windsor and Phillip Wallace ("Wallace"), the Director of Compliance at Jeunesse, that contains an attachment of what appears to be a screenshot from a cellular device of an e-mail sent by Courtney Clark ("Clark), a partner in Jeunesse. According to Nerium, Clark sent this e-mail to Nerium brand partner Pamela Martin ("Martin"), and Martin subsequently forwarded the e-mail to Nerium's compliance department. Def.'s Resp., Doc. 127 at 21; Def.'s App., Doc. 128 at 203-213. In the e-mail to Martin, Clark writes in part:

> My name is Courtney Clark. I am a partner in Jeunesse Global and you were referred to me by one of our newly appointed senior officers. Dennis Windsor, the cofounder of Nerium is now our Chief Development Officer at Jeunesse Global. Your success within the Nerium organization proves what an asset you could be with us. . . . We are excited at the opportunity to double, possibly triple our position in the market as we attract people like Dennis and hopefully successors like yourself.

Def.'s App., Doc. 128 at 204. Nerium also cites one of the brand-partner reports that Windsor backed up to his personal device that shows Martin's name, rank, and identification number at

Nerium. Def.'s Resp., Doc. 127 at 21; Def.'s App., Doc. 128 at 490. Nerium argues that this evidence, when viewed together, establishes as minimum a material question of fact as to whether Windsor improperly disclosed or used of Nerium's trade secrets.

In response, Windsor contends that this e-mail does not contain trade secrets or confidential information, as it merely includes the name and e-mail address of a Nerium brand partner. Windsor asserts that "Nerium's business model, as with all other [multi-level marketing] companies, requires that Brand Partners make themselves known to the public in order to sell their company's product. The more visible a Brand Partner is—whether through various social media[] platforms, blogs, the internet, or in person—the better." Pl.'s Reply, Doc. 136 at 5. Windsor contends that he was not subject to a nonsolicitation or noncompete agreement and, therefore, was free to reach out to Nerium brand partners. *Id*.

After reviewing the evidence and parties' positions, the court determines that a genuine dispute of material fact exists as to whether Windsor, in recommending that Jeunesse attempt to recruit Martin, relied on publicly available information that she was a current Nerium brand partner, or whether he used the brand-partner reports that he uploaded from his Nerium work laptop in identifying her as a Nerium brand partner.

With respect to whether Nerium has presented evidence of injury, Windsor argues that Nerium has presented no evidence of profits lost by Nerium or gained by Windsor, or evidence of the trade secret's value or the cost to develop it, to recover damages for misappropriation. Windsor argues that, to the extent Nerium seeks injunctive relief, that the Preservation Agreement into which Windsor entered in September 2016 already enjoined him from possessing or using Nerium's proprietary property. Pl.'s Reply, Doc. 136 at 6-7.

In response, Nerium attaches invoices reflecting the expenses it incurred in hiring Epiq Global, a forensics and collections provider, that examined Windsor's personal devices to recover and attempt to secure its trade secrets. Def.'s Resp., Doc. 127 at 22; Def.'s App., Doc. 128 at 216, 397-424. Nerium also argues that, to seek injunctive relief under TUTSA and DTSA, it is not required to show damages if there is a showing of actual or threatened misappropriation.

"Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret[;] the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a 'reasonable royalty.'" *Wellogix, Inc. v. Accenture*, L.L.P., 716 F.3d 867, 879 (5th Cir. 2013) (citation and quotation marks omitted). The court determines that Nerium has failed to set forth evidence of the type of economic damages contemplated under the flexible approach taken to calculating damages in trade secrets misappropriation cases. Nerium has not cited any case authority in support of its contention that costs incurred in recovering trade secrets, absent additional evidence of pecuniary damages, are sufficient to entitle Nerium to this type of recovery. The court does, however, determine that Nerium has established that a genuine dispute of material fact exists as to whether there has been actual misappropriation by Windsor to entitle Nerium to injunctive relief. *See* Tex. Civ. Prac. & Rem. Code § 134A.003(a) ("Actual or threatened misappropriation may be enjoined[.]"); 18 U.S.C. § 1836(b)(3)(A)(i) ("[A] court may grant an injunction to prevent any actual or threatened misappropriation[.]").

For the reasons herein stated, the court determines that Nerium has raised a genuine dispute of material fact in response to Windsor's no-evidence summary judgment motion as to its trade secrets misappropriation claim and will deny the motion as to this claim.

## I. Nerium's Breach of Fiduciary Duty and Breach of Duty of Loyalty Claim

Nerium's third counterclaim asserts that Windsor violated a fiduciary duty, including a duty of loyalty, that he owed to Nerium as a result of his employment, which he breached by secretly retaining Nerium's trade secret information in back-up copies on his personal devices. Def.'s Answer, Doc. 20, ¶ 147. Nerium contends that, as its first president and an employee, Windsor owed Nerium a fiduciary duty that was breached when he misappropriated its trade secrets and, prior to his termination, he was negotiating for a position with Jeunesse. Nerium contends that it suffered out-of-pocket expenses in attempting to recover and secure the Nerium data. Windsor moves for summary judgment on this counterclaim on the basis that Nerium has failed to establish Windsor was a fiduciary; failed to establish that Windsor breached a duty of loyalty or fiduciary duty; and failed to establish that the alleged breach proximately caused injury.

Under Texas law, the elements of a breach of fiduciary duty claim are: (1) the plaintiff and defendant had a fiduciary relationship; (2) the defendant breached its fiduciary duty to the plaintiffs; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007). One type of fiduciary relationship recognized under Texas law is an informal fiduciary relationship, which can arise between an employee and employer. *Id*. at 283. "An employee may prepare to go into competition with his employer—before resigning—without breaching fiduciary duties owed to that employer," but an employee 'may not appropriate his employer's trade secrets' or 'carry away certain information, such as lists of customers.'" *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 668 (S.D. Tex. 2010) (quoting *Navigant Consulting, Inc.*, 508 F.3d at 284).

The court determines that a genuine dispute of material fact exists as to whether Windsor, while an employee at Nerium and prior to his termination, took steps to appropriate Nerium's trade

secrets and then "carried away" confidential information that may be subject to trade secret protection. The court further determines that Nerium has set forth sufficient evidence, such as the expenses it incurred in recovering the data from Windsor's device, to raise a fact question as to whether it suffered an injury. The court accordingly will deny Windsor's motion for summary judgment as to this claim.

**J. Nerium's Counterclaim for Conversion**

Nerium asserts a counterclaim for conversion based on the same factual allegations asserted in his trade secrets misappropriation claim. "Conversion is defined as the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his [or her] rights." *Bandy v. First State Bank*, 835 S.W.2d 609, 622 (Tex. 1992) (citation and internal quotation marks omitted). "The taking of a party's confidential client list and trade secrets can be the basis for a conversion claim. Where the property at issue in a conversion claim is essentially information, and not a tangible item, the plaintiff has to show that the defendant intended to deprive the plaintiff of the information, or that the defendant intended to use the information in a manner that excluded or was inconsistent with the plaintiff's rights." *Cuicado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs.*, LLC, 404 S.W.3d 737, 749 (Tex. App.—El Paso 2013, no pet.)) (citations and internal quotation marks omitted).

Windsor contends that Nerium has failed to establish each element of conversion. The court disagrees and determines that, in light of the evidence it reviewed with respect to Nerium's trade secret misappropriation claim, a genuine dispute of material fact exists in light of Windsor's decision to delete the documents on his Nerium work laptop and create back-up copies on his personal device. The court determines that, if Windsor improperly created copies of Nerium's alleged trade secrets, and subsequently disclosed those trade secrets to Jeunesse, such conduct

would be inconsistent with Nerium's rights. Nerium has adequately raised a genuine dispute of material fact regarding the issues of damages by establishing that it incurred expenses in attempting to recover and secure the Nerium data that he allegedly improperly retained. Accordingly, Windsor is not entitled to summary judgment on Nerium's conversion counterclaim.

### K. Nerium's Counterclaims for Declaratory Judgment of No Copyright Infringement, Copyright Invalidity and Implied License

Nerium seeks a declaratory judgment that: (1) the alleged copyrighted works asserted by Windsor in his Third Amended Complaint are works for hire owned by Nerium; (2) Nerium has not infringed and does not infringe any valid and enforceable copyrights in the alleged copyrighted works; (3) the alleged copyrights are invalid; and (4) to the extent Windsor has a valid copyright in the works, Nerium has an implied license in them that is irrevocable and unlimited in scope. Def.'s Answer, Doc. 20, ¶¶ 164, 169, 177, and 184.

#### 1. Declaratory Judgment of Copyright Ownership

In its fifth counterclaim, Nerium seeks a declaratory judgment that the alleged copyrighted works are works for hire that are owned by Nerium. Under 17 U.S.C. § 101, a work for hire is defined as "a work prepared by an employee within the scope of his or her employment." "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author . . . and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 207(b).

With respect to the "Compensation Plan," Nerium argues that the summary judgment evidence demonstrates that the work was originally co-authored by a number of people, including Amber Olson Rourke ("Rourke"), who ran point on "the actual book and document. Def.'s Resp., Doc. 127 at 29 (citing Rourke Dep., Def.'s App., Doc. 128 at 23-26). Nerium does not set forth evidence that, at the time Rourke co-authored the 2011 original "Compensation Plan," she was an

employee, which is required to establish ownership based on a work for hire theory. Nerium does, however, set forth evidence that when Rourke was employed by Nerium after its 2011 launch, she co-authored later versions of the document. Def.'s Resp., Doc. 127 at 31 (citing Rourke Decl., Def.'s App., Doc. 128 at 428. With respect to the "MLM Roadmap to Lexus," Nerium similarly agues that the work was co-authored by Rourke and others prior to the 2011 launch and, after launch, Rourke co-authored later versions of the work as a Nerium employee.

In his motion for summary judgment, Windsor argues that he is entitled to summary judgment on Nerium's declaratory judgment counterclaim of copyright ownership because "there is no evidence that Plaintiff Windsor was an employee of Defendant Nerium at the time he created the Copyright Works and there is no evidence that there has ever been a written work for hire agreement" between the parties. Pl.'s Mot. for Summ. J., Doc. 117 at 20.

Neither party addresses the threshold issue that the court must consider in determining Nerium's copyright ownership rights in the works: whether the works are entitled to copyright protection at all. As explained in a previous section of this opinion, the court determined that the "Compensation Plan" relied on by Windsor in his copyright claim was not subject to copyright protection because it is an unoriginal spreadsheet containing fragmentary and functional short phrases and data. The court likewise determined the "MLM Roadmap to Lexus" was not copyrightable. In pleading its counterclaim and responding to Windsor's motion, Nerium fails to make the preliminary showing that it has a valid copyright in the work, which is shown by "proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities." *Eng'g Dynamics*, 26 F.3d at 1340. This Nerium has not done. Contrary to Nerium's assertion that it does not bear the burden of proof as to the issue of copyright ownership, to prevail on its counterclaim, Nerium must present evidence that it owns a valid and enforceable

copyright in the work. *See Fontenot*, 780 F.2d at 1194 ("[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.").

As Nerium has failed to show that the works are copyrightable, the court determines that no genuine dispute of material fact exists as to whether Nerium owns a copyright in the work, irrespective of the applicability of the work-for-hire doctrine. Accordingly, the court **grants** Windsor's motion for summary judgment with respect to Nerium's counterclaim for a declaration that it has copyright ownership in the "Compensation Plan" and "MLM Roadmap to Lexus" and further **declares** that it does not have a copyright ownership in such works.

## 2. Declaratory Judgment of No Copyright Infringement, Copyright Invalidity, and Implied License

In its sixth counterclaim, Nerium seeks a declaration that it has not infringed any valid and enforceable copyrights in the alleged copyrighted works. In its seventh counterclaim, it seeks a declaration that Windsor does not have valid and enforceable copyrights in the alleged works. In its eighth counterclaim, Nerium seeks a declaration that, to the extent the court determines Windsor does have a copyright in the works, Nerium has an implied license to use them. Windsor moves for summary judgment on these counterclaims and seeks their dismissal for arguments that are identical to those advanced in support of his copyright infringement claim.

As the court has determined in section III(A) of this opinion that no genuine dispute of material fact exists as to whether Windsor owns a valid and enforceable copyright in the alleged works, the court **denies** Windsor's summary judgment motion with respect to these declarations in Nerium's sixth, seventh, and eighth counterclaims. It would be improper to grant summary

judgment on these counterclaims in light of the court's ruling as to Windsor's copyright infringement claim.

## IV. Conclusion

For the reasons herein stated, the court determines that Plaintiff has failed to raise a genuine dispute of material fact as to its federal and state law claims alleged in the Third Amended Complaint. The court accordingly **grants** Defendants' Motion for Partial Summary Judgment (Doc. 110) with respect to Plaintiff's claims for copyright infringement, breach of contract, fraudulent inducement/fraud, promissory estoppel, unjust enrichment, and declaratory relief relating to these claims; and they are **dismissed with prejudice**. The court **grants in part** and **denies in part** Plaintiff's Motion for Summary Judgment (Doc. 115) with respect to Defendant Nerium's counterclaims for trade secrets misappropriation under DTSA and TUTSA, breaches of fiduciary duty and duty of loyalty, conversion, and declaratory relief relating to copyright ownership over the works at issue in this action. The court specifically **grants** Plaintiff's motion with respect to Nerium's counterclaim seeking a declaration that it has a copyright ownership in the alleged works and **denies** Plaintiff's motion with respect to Nerium's counterclaims seeking a declaration that it has not infringed on the alleged works, that Windsor has no valid copyright in the alleged works, and that, alternatively, Nerium had an implied license to use the works. The claims that remain for trial are Defendants' counterclaims under the Defend Trade Secrets Act, the Texas Uniform Trade Secrets Act, breaches of fiduciary duty and duty of loyalty, and conversion.

Now that the court has ruled on the parties' motions for summary judgment and narrowed the issues for trial, the parties should seriously consider whether this action can be resolved without the necessity of a trial. For this reason, the court **extends** the deadline for filing the initial pretrial

material to **May 15, 2019**. The parties are to inform the court in writing by **noon, Tuesday, May 14, 2019**, whether settlement is a viable option.

      **It is so ordered** this 10th day of May, 2019.

Sam A. Lindsay
United States District Judge